In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00286-CR**
**NO. 09-24-00287-CR**

_____

**GABRIEL ANTHONY GONZALEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 9th District Court**
**Montgomery County, Texas**
**Trial Cause Nos. 23-04-05510-CR, 23-08-12439-CR**

## MEMORANDUM OPINION

In two indictments, trial cause numbers 23-04-05510-CR and 23-08-12439-CR, a grand jury indicted Gabriel Anthony Gonzalez for sexual assault of a child, a second-degree felony punishable by two to twenty years imprisonment and a fine not exceeding $10,000. *See* Tex. Penal Code Ann. §§ 12.33, 22.011(a)(2)(A), (f). Gonzalez waived his right to a jury trial, and in an open plea, Gonzalez pled guilty to each offense. The trial court accepted Gonzalez's guilty plea and scheduled a

sentencing hearing to allow time for the Community Supervision Department to complete a pre-sentence investigation. The State also filed a motion to cumulate the sentences. After considering evidence from the State and Gonzalez, the trial court sentenced Gonzalez to twenty years of incarceration on each charge and cumulated the sentences.

The trial court certified Gonzalez's right to appeal, noting this was "not a plea bargain case." In two issues, Gonzalez argues: (1) the terms of the "plea agreement" were "manifestly unjust because the agreement lacks valid consideration from the State[,]" thus "the sentence resulting from the plea agreement is unenforceable[;]" and (2) policy considerations mandate that plea bargains result in a lesser sentence than the maximum, otherwise the State risks wasting valuable judicial and prosecutorial resources. For the reasons discussed below, we affirm the trial court's judgments.

**Background**

The record shows that Gonzalez pled guilty to sexually assaulting two children, "Rhea" and "Carrie."[1] He signed plea admonishments indicating each was a second-degree felony with up to twenty years in prison and stating that there was

---

[1] We use pseudonyms to refer to the victims, both minors, to protect the victims' privacy. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal judicial process").

2

no recommendation or agreement with the State as to punishment. He also signed supplemental sex offender registration admonishments in each cause. His attorney also signed the admonishments.

On April 22, 2024, at the plea hearing, the trial court explained that Gonzalez was charged with "two second-degree felony offenses of sexual assault of a child. The punishment range for that charge is 2 to 20 years in prison and up to a $10,000 fine." Gonzalez indicated that he understood the charges. Gonzalez denied any history of mental illness, and his attorney indicated that Gonzalez was competent, so the trial court found him to be competent to stand trial. The trial court noted, "You don't have an agreement with the State of Texas[,]" and that Gonzalez was asking to proceed without a punishment recommendation; he explained the Court would order a pre-sentence investigation (PSI) report then proceed with a sentencing hearing later but would accept a guilty plea that day.

The following exchange then occurred:

THE COURT: All right. How do you plea[d] to the two second-degree felony offenses of sexual assault of a child?

THE DEFENDANT: Guilty.

THE COURT: Are you pleading guilty because you're actually guilty and for no other reason?

THE DEFENDANT: Yes, sir.

THE COURT: Are you pleading guilty freely and voluntarily?

THE DEFENDANT: Yes, sir.

3

At the subsequent punishment hearing, both the State and Gonzalez presented evidence. The State first called Detective Jason Rose with the Montgomery County Sheriff's Office. Rose testified that he worked this case involving Gonzalez, which began when Rhea's mother came forward claiming that Rhea had been sexually assaulted by an adult. Rose described what the investigation entailed. This included, among other things, obtaining video from locations that confirmed what the child described, including Gonzalez's car arriving, then the victim getting into the vehicle. He also submitted a used condom that Rhea provided to the crime lab and explained that Rhea underwent a forensic interview in which she claimed Gonzalez had sex with her multiple times. The DNA from inside the condom matched Gonzalez, and there was touch DNA from Rhea.

Rose explained that Rhea initially met Gonzalez through the Wizz App, which is supposed to have guardrails to protect children, but they later began communicating through Snapchat. They obtained the records from these applications showing Rhea's and Gonzalez's usernames. At the time, Rhea was fifteen, and Gonzalez was twenty-two, so he had to lie about his age to talk to her. Rose said that when they received the Snapchat records, it showed that Gonzalez had thousands of conversations with "gobs" of unnamed people,

4

along with hundreds of photos of male and female juveniles dressed and undressed.

During Rose's testimony a summary of the Snapchat records was also admitted into evidence that: showed Gonzalez engaging in grooming behavior with some of the children; listed individuals he asked to provide child pornography from and those he provided sexually explicit pictures to; indicated he asked minors to meet; showed he expressed a preference for young people aged thirteen to fifteen of both sexes; and showed he told one juvenile he had sex with four minors. The summary also showed that Gonzalez interacted with over thirty individuals between the ages of thirteen and sixteen. Transcripts of the Snapchat conversations were also admitted into evidence.

According to Rose, the messages indicated that Gonzalez was knowingly breaking the law. Rose also learned during the investigation from the university Gonzalez attended that multiple people complained he harassed them.

Rose testified that Gonzalez was initially charged with one count of sexual assault of a child, but he violated his bond conditions by contacting children and being on the internet. So, Rose investigated further, and all the IP addresses came back to the area Gonzalez lived in, showing multiple

accounts for him. Screenshots of different accounts Gonzalez had were also admitted into evidence.

Rose explained that after Rhea, they learned Gonzalez had more victims, including Carrie, who was in Montgomery County. He testified that the Snapchat messages showed that Carrie sent naked pictures. Later, Carrie disclosed that Gabriel met her at her house, and they had sex.

Rhea testified that she initially met Gonzalez through the Wizz App and believed he was younger, given the app's safeguards. She later learned he lied about his age. She said that Gonzalez made her feel special by telling her she was pretty, but he eventually turned the conversation sexual. She explained that she felt pressured to meet him in person. According to Rhea, she and Gonzalez met four or five times and had sex each time. She also sent him inappropriate pictures on the internet.

Carrie also testified that she met Gonzalez on the Wizz App, which showed his age as fifteen, although he was twenty-two. Carrie was fourteen then. She said that Gonzalez eventually turned the conversation sexual and told her things that made her feel good, like she was beautiful. He asked Carrie to send pictures without her clothes on, which she did. Gonzalez asked her to meet late at night so they could "do stuff in his car[,]" but Carrie could not get out of her house, so she told him they

6

could meet the next day. She testified they met the next day, went into her room and did sexual things. She felt like Gabriel took advantage of her.

A volunteer chaplain with the Montgomery County jail, Patrick Shannon, testified for Gonzalez. He explained that Gonzalez came to his weekly Bible study, and Shannon said he encouraged Gonzalez in his faith. Shannon testified that he believed there should be consequences but also believed in mercy.

Gonzalez's mother testified about being divorced from his father, who lived in Costa Rica. She understood that Gabriel had been charged with something very bad but claimed his family and church would support him if he was given probation. She testified that Gabriel tried to kill himself in 2020 after his father came to the house and beat him.

At the end of the hearing, the trial court sentenced him to twenty years in prison for each case and granted the State's motion for cumulation. The trial court ordered that the sentence in 23-08-12439-CR would not begin until his sentence is complete in 23-04-05510-CR.

In two issues, Gonzalez argues (1) the "terms of the plea agreement" are "manifestly unjust" as it resulted in the maximum sentences, since the State gave no consideration for his guilty plea, and (2) policy reasons mandate a lesser sentence than the maximum when there is a plea bargain.

## Standard of Review

Gonzalez seemingly complains he received the maximum sentences, so we would review these sentences under a "gross disproportionality" standard. *See Jarvis v. State*, 315 S.W.3d 158, 162 (Tex. App.—Beaumont 2010, no pet.) (citing *Ex parte Chavez*, 213 S.W.3d 320, 323–24 (Tex. Crim. App. 2006) ("Subject only to a very limited, 'exceedingly rare,' and somewhat amorphous Eighth Amendment gross-disproportionality review, a punishment that falls within the legislatively prescribed range, and that is based upon the sentencer's informed normative judgment, is unassailable on appeal.") (other citation omitted)). Although in his Reply Brief, Gonzalez disavows that he is making an Eighth Amendment disproportionality challenge, the substance of his complaint is that these maximum sentences are "manifestly unjust." Thus, we will review them as such.

## Applicable Law

"[P]lea bargaining is the process by which the defendant in a criminal case relinquishes his right to go to trial in exchange for a reduction in charge and/or sentence." *Perkins v. Ct. of Appeals for Third Sup. Jud. Dist.*, 738 S.W.2d 276, 282 (Tex. Crim. App. 1987) (citations omitted). Conversely, in an open plea a "defendant pleads guilty without an agreement about the precise punishment he will receive[.]" *Harper v. State*, 567 S.W.3d 450, 454 (Tex. App.—Fort Worth 2019, no pet.).

To satisfy due process requirements, a guilty plea must be made voluntarily, with sufficient awareness of the plea's consequences. *See* U.S. CONST. amend. XIV; *Ex parte Palmberg*, 491 S.W.3d 804, 807 (Tex. Crim. App. 2016); *see also Ex parte Arjona*, 402 S.W.3d 312, 314 (Tex. App.—Beaumont 2013, no pet.) ("Due process requires that a guilty plea be considered valid only if the plea represents a voluntary and knowing choice among the alternative courses of action available to the defendant."). "But a defendant need not have a comprehensive awareness of the specific impact that relinquishing his constitutional rights may have; sufficient awareness does not require complete knowledge of the prosecution's case." *Palmberg*, 491 S.W.3d at 807.

To assure the voluntariness of a defendant's plea and his awareness of its consequences, the Code of Criminal Procedure outlines the requisites in accepting a guilty plea. *See* Tex. Code Crim. Proc. Ann. art. 26.13; *see also VanNortrick v. State*, 227 S.W.3d 706, 708 (Tex. Crim. App. 2007) (explaining that the purpose of the article 26.13 admonitions ensures that the defendant's guilty plea comports with due process, but those admonitions themselves are not constitutionally required). These procedures include admonishing the defendant, either orally or in writing, of the punishment range, the requirement to register as a sex offender, and the requirement that the trial court assure itself "that the defendant is mentally competent and the plea is free and voluntary." *See* Tex. Code Crim. Proc. Ann. art.

9

26.13(a), (b). Neither due process nor the statutory sentencing procedure requires the trial court to set forth the basis of its sentencing decision. *See Palmberg*, 491 S.W.3d at 807 (referencing a voluntary and intelligent choice, but not the basis of the trial court's sentencing decision); *see also* Tex. Code Crim. Proc. Ann. art. 26.13(a), (b) (not including the trial court's reasoning for its sentencing decision).

"'At its core, a plea bargain is a contract between the state and the defendant.'" *Thomas v. State*, 516 S.W.3d 498, 502 (Tex. Crim. App. 2017) (quoting *Moore v. State*, 295 S.W.3d 329, 331 (Tex. Crim. App. 2009)). A contract resulting from the plea-bargaining process is "the product of a defendant's relinquishment of his right to go to trial in exchange for a reduction in the charge and/or sentence." *Id.* (citation omitted).

The two basic types of plea bargains are (1) sentence bargains and (2) charge bargains. *Shankle v. State*, 119 S.W.3d 808, 813 (Tex. Crim. App. 2003); *see also Thomas*, 516 S.W.3d at 502. "Sentence bargaining involves a situation in which a defendant agrees to enter a plea of guilty in exchange for the State's binding or non-binding recommendation to the court regarding punishment." *Thomas*, 516 S.W.3d at 502 (citation omitted). Charge bargaining "involves questions of whether a defendant 'will plead guilty to the offense that has been alleged or to a lesser or related offenses, and of whether the prosecutor will dismiss, or refrain from bringing, other charges.'" *Id.* (quoting *Shankle*, 119 S.W.3d at 813).

In contrast, an "open plea" occurs when a defendant pleads guilty without any agreement with the State. *See Harper*, 567 S.W.3d at 454. Courts have explained the imprecision of the phrase "open plea," given that it is also sometimes used to refer to "a plea where charge bargaining, but not sentence bargaining, has occurred." *Id.* (quoting *Kassube v. State*, Nos. 12-08-00364-CR, 12-08-00365-CR, 2010 WL 697362, at *2 n.3 (Tex. App.—Tyler Feb. 26, 2010, no pet.) (mem. op., not designated for publication)); *see also Allen v. State*, No. 02-25-00277-CR, 2026 WL 1700307, at *1 n.1 (Tex. App.—Fort Worth June 11, 2026, no pet. h.) (mem. op., not designated for publication) (explaining that an open plea of guilty, with no agreement as to punishment and with no consideration given by the State for any waiver does not limit a defendant's right to appeal); *Richardson v. State*, Nos. 02–15–00271–CR, 02–15–00272–CR, 2016 WL 6900901, at *5 (Tex. App.—Fort Worth Nov. 23, 2016, pet. ref'd) (mem. op., not designated for publication) (explaining that the State gave no consideration to defendant's guilty pleas in aggravated assault case, thus those guilty pleas were not made pursuant to a plea bargain but were instead open pleas); *Solis-Caseres v. State*, No. 09-13-00580-CR, 2015 WL 993476, at *8 (Tex. App.—Beaumont Mar. 4, 2015, no pet.) (mem. op., not designated for publication) (explaining in context of right to appeal, defendant "pleaded guilty under an open plea with no agreement as to punishment, and there was no consideration given by the State" for defendant's waiver, so the trial judge's

11

certification that defendant could appeal was supported by the record). An absence of consideration from the State implicates presentence waivers of the right to appeal, which are only enforceable if they are part of a plea bargain or when the State has given some consideration for the waiver. *See Ex parte Broadway*, 301 S.W.3d 694, 697–99 (Tex. Crim. App. 2009).

**Analysis**

On appeal, Gonzalez focuses on a lack of consideration given by the State, which he contends makes his "plea agreement" in the form of a "charge bargain" invalid. Gonzalez's argument is problematic, as it mischaracterizes what appears to be an open plea as a plea agreement—specifically a charge bargain—and this difference matters. *See Harper*, 567 S.W.3d at 454 (discussing open plea); *Thomas*, 516 S.W.3d at 502 (discussing sentence bargains and charge bargains). The parties do not dispute that the State did not give consideration, which reflects an open plea. While such an absence of consideration could implicate Gonzalez's waiver of the right to appeal, here there was no such waiver. *See Broadway*, 301 S.W.3d at 697–99; *see also Allen*, 2026 WL 1700307, at *1 n.1; *Richardson*, 2016 WL 6900901, at *5; *Solis-Caseres*, 2015 WL 993476, at *8. Instead, the record shows the trial court recognized the absence of a plea agreement and told Gonzalez, "You don't have an agreement with the State of Texas[,]" and that Gonzalez was asking to proceed without a punishment recommendation. The record also shows that the trial court's

12

certification indicated that Gonzalez had the right to appeal, and this was not a plea bargain case. Gonzalez likewise notes in his brief that "[t]here were no other indicted charges that were dropped nor was there an agreement to a lesser sentence." Now, Gonzalez seeks to invalidate his guilty plea based on a lack of consideration despite knowing there was no agreement as to punishment and that he asked to proceed without it. Had this been a plea bargain agreement between the State and Gonzalez, traditional contract principles would dictate some consideration by the State, like agreeing to a lower punishment or to forgo additional or more severe charges. *See Thomas*, 516 S.W.3d at 502; *Moore*, 295 S.W.3d at 331.

That said, the record shows that this was an open plea, recognized by the trial court and the parties as such. *See Harper*, 567 S.W.3d at 454. Gonzalez does not argue that the waiver of his right to a jury trial was unknowing or involuntary, and the record shows the opposite as he signed the requisite admonishments, and the trial court determined he was competent before accepting his plea.[2] *See* Tex. Code Crim. Proc. Ann. art. 26.13; *see also VanNortrick*, 227 S.W.3d at 708. We can also find no authority to support the proposition that the absence of consideration for his open plea of guilty invalidates that guilty plea when a defendant receives the maximum punishment.

---

[2]Gonzalez notes in his brief that the waiver of the right to appeal must be voluntary, knowing, and intelligent. That said, no waiver of his right to appeal was implicated in this case.

Here, the sentence was not grossly disproportionate, as it was within the maximum range, and the trial court was statutorily authorized to cumulate the sentences. *See Chavez*, 213 S.W.3d at 323–24; *Jarvis*, 315 S.W.3d at 162; *see also* Tex. Penal Code Ann. § 3.03(b) (allowing for cumulation of sentences in certain situations). The evidence adduced at the sentencing hearing showed that Gonzalez attempted to prey on over thirty juveniles, he did so knowing he was engaging in criminal conduct, he lied about his age, and he violated bond conditions by communicating with children on the internet. Gonzalez pled guilty to two counts of sexual assault of a child, each of which was a second-degree felony. *See* Tex. Penal Code Ann. § 22.011(a)(2)(A), (f). The punishment range for such an offense is not more than twenty years or less than two years. *Id.* § 12.33(a). Each of Gonzalez's twenty-year sentences was thus "within the statutorily prescribed range" for each conviction, and the trial court's decision to cumulate the sentences "did not raise the 'statutory maximum' punishment for either offense." *Barrow v. State*, 207 S.W.3d 377, 379 (Tex. Crim. App. 2006).

The lack of consideration from the State reflects there being no agreement. Gonzalez's argument that this was a "plea agreement" and specifically, a "charge bargain" is unsupported by the record and lacks merit. We overrule issue one.

In his second issue, Gonzalez contends that policy considerations mandate that plea bargains result in a lower sentence. He argues that "[w]ithout ensuring the

plea bargain system remains an incentivized option for criminal defendants, the entire justice system is at risk of imploding." Even if true, as explained above, this case did not involve a plea bargain agreement. Rather, it involved an open plea, and there was no bargained-for reduction of the sentence or charges. We overrule issue two.

## Conclusion

Having overruled Gonzalez's issues, we affirm the trial court's judgments.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on April 21, 2026
Opinion Delivered July 22, 2026
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.